(No. 35953·

L. W. HOWARD *et al.*, Appellants, *vs.* SAMUEL T. LAWTON
*et al.*, Appellees.

*Opinion filed June 14, 1961.*

332

GARDNER, CARTON, DOUGLAS, ROEMER and CHILGREN, of Chicago, (JAMES A. VELDE, JOSEPH P. CARR, and WARE ADAMS, of counsel,) for appellants.

JOHN C. MELANIPHY, Corporation Counsel, of Chicago, (SYDNEY R. DREBIN, ROBERT J. COLLINS and ALLEN HARTMAN, Assistant Corporation Counsel, of counsel,) for appellees.

Mr. JUSTICE HOUSE delivered the opinion of the court:

This is an action for administrative review of a decision of the zoning board of appeals of the city of Chicago upholding the refusal of the city's zoning administrator to grant a building permit and denying an application for installation of "piggyback" facilities in the Rockwell Street yard as a special use. The superior court of Cook County affirmed the board's decision and upheld the constitutionality of the zoning ordinance.

Defendants question our jurisdiction on direct appeal. They contend that plaintiffs did not properly raise the issue of violation of the due-process and equal-protection clauses of the Federal and State constitutions. This seems to be predicated on the theory that where the record is made on a review of the propriety of the administrative body's decision, the validity of the zoning ordinance under which the administrative proceeding is brought is not subject to attack.

First, it is suggested that the validity of the zoning ordinance cannot be raised in the same count seeking administrative review of the board's decision because they are repugnant to each other and are separate causes of action. As a corollary to this suggestion, it is contended that raising the question of validity is the equivalent of a declaratory judgment action and that notice should have been given to owners of property within 250 feet of the subject yard under section 73—4(e) of the Revised Cities and Villages Act. (Ill. Rev. Stat. 1959, chap. 24, par. 73—4(e).) It was the construction of the ordinance by the administrative board which resulted in the alleged constitutional violations and was an integral part of review of the board's action, therefore it did not have to be pleaded in a separate count. The trial court took jurisdiction under the Administrative Review Act and the proceedings, including notice, were conducted under that act and were not subject to the rules applying to an independent declaratory judgment action.

Second, it is contended that constitutional issues cannot be raised in a complaint for administrative review. We have recognized the contrary practice, (see *Ronda Realty Corp.* v. *Lawton,* 414 Ill. 313,) and for good reason. To hold otherwise would result in piecemeal litigation by first requiring review of an administrative body's decision and then entertaining another action to test constitutionality brought on by such decision.

Defendants next argue that there is no evidence in the record pertaining to the validity of the ordinance as to the

subject property. They seem to infer that a different type of proof is required to support the charge of invalidity. This does not necessarily follow. The scope of review by a court of original jurisdiction under section 11 of the Administrative Review Act, (Ill. Rev. Stat. 1959, chap. 110, par. 274,) extends to all questions of law and fact presented by the record. If the whole record discloses, as here, that there is a fairly debatable question whether the zoning ordinance upon which the administrative decision is based is arbitrary and unreasonable and without substantial relation to the public health, safety, morals or general welfare, it is proper for the court to consider and pass upon its validity when that issue has been raised in the complaint.

We are of the opinion that direct appeal lies to this court on constitutional grounds, although under our view the issues may be resolved without deciding the constitutional questions raised. We pass upon constitutional issues only where the cause cannot be decided on other grounds. *Osborn* v. *Village of River Forest,* 21 Ill.2d 246; *People ex rel. Romano* v. *Krantz,* 13 Ill.2d 363.

Before passing to the substantive issues we consider the remaining contention that the constitutional objections are premature because of plaintiffs' failure to exhaust their remedy at the local level, that is, seeking an amendment from the city council. Defendants rely upon the rule laid down in *Bright* v. *City of Evanston,* 10 Ill.2d 178, in support of their theory. The *Bright* doctrine does not apply here because the Chicago zoning ordinance provides that all decisions of the board of appeals shall be final administrative determinations reviewable by a court, while under the Evanston ordinance all final decisions on variations were vested solely in the city council. The *Bright case* was a declaratory judgment action, not administrative review. As we have heretofore noted, the trial court's review extends to all issues raised in an administrative review proceeding,

and it was therefore unnecessary for plaintiffs to seek further relief at the local level.

This action arises out of the proposal of the Chesapeake and Ohio Railway Company (C. & O.) to provide facilities for "piggyback" service at the Rockwell Street yard in Chicago. Piggyback service is the long hauling of trailers on special flat cars by rail, two trailers to a car. They are hauled to and from a railway terminus by motor truck tractors. The facilities proposed at this yard include: a blacktop road 30 feet wide on the north edge of the yard from Kedzie to California, a paved loading movement area, a paved parking area, two 60-foot ramps and center platform, lights, two tracks to be connected with the yard track system (with two additional to be provided if business warrants), and a 12 by 16-foot building to be used as an office and sanitary facilities for a checker who would collect bills of lading.

The area in which the yard is located was zoned under the 1923 and 1942 ordinances as a manufacturing district, and the latter included, as permitted uses, a railroad freight terminal and a switching and classification yard. Under the 1957 zoning ordinance the yard was included in a larger area which is zoned M1-1 (Restricted Manufacturing). Permitted uses include railroad rights of way, rest houses and camps, but it designates railroad freight terminals and switching or classification yards as special uses.

Plaintiffs made application to the zoning administrator for a building permit to erect the small building. Upon its denial an appeal was taken to the zoning board. On the same day application was made for approval of a special use, requesting approval for construction of the piggyback facilities. During the hearing the application was amended to contend in the alternative that applicants had the right to institute the operation as an extension of the present legal special use. After extensive hearings the board rendered a

decision denying the appeal from the zoning administrator, refused the application for a special use of the property for piggyback operations, and ignored the contention that piggyback operations may be conducted without special permission required for a new special use.

The Rockwell Street yard is leased by the C. & O. from the Belt Railway as its Chicago terminal and is the point of origin and destination for trains to and from Detroit and Cincinnati. The yard is a strip 12 blocks long running from South Kedzie Avenue on the west to Rockwell Street on the east between 74th and 75th Streets. It contains about 31 parallel railroad tracks of which 22 are used exclusively by the C. & O. as classification tracks. The C. & O. also has 7 or more "rip tracks" used for repairs, it has 5 spur tracks on which road and yard cabooses are stored, and it has the joint use of five main or thoroughfare tracks in the middle of the yard with the Belt and other carriers. Several other tracks in the yard are used by the Belt to serve adjacent industrial plants.

The yard operates on a 24-hour basis. The C. & O. has 12 inbound and a like number of outbound trains per day. Upon arrival the trains are broken up and the sealed cars are switched to various tracks depending upon final destination. The reverse is true for outgoing trains. Approximately 1000 cars are switched a day. The yard is used exclusively for railroad purposes and contains a bunk house, a 74-room dormitory building, two-story yard office, superintendent's office, a repair shop for diesels, and a yard house.

The defendants contend and the board found that the proposed operation would create a railroad freight terminal, which is a use completely different from a switching or classification yard. The plaintiffs argue that the proposed operation is the same as, or a slight extension of, the existing special use.

The defendants point out that at present no freight is being loaded or unloaded in plaintiffs' classification yard,

except for auxiliary and service use in the yard, and there are no facilities in the yard for loading or unloading freight, except for the bad-order department. They assert that trailers are freight and that to permit them to be loaded and unloaded at the Rockwell Street yard would constitute a new use of the land, namely, a freight terminal. The plaintiffs, on the other hand, point out that the proposed operation will not involve the loose handling of freight nor the construction of a freight warehouse because the trailers are loaded and unloaded elsewhere. They argue that handling of trailers as sealed containers is essentially the same as its present operation because each involves the classification, switching and rerouting of freight in a sealed container to its ultimate destination, each requires the handling of unopened containers, each requires and uses separate although different motive power to move the wheeled containers, and neither requires the handling of loose freight or a warehouse.

Voluminous evidence was introduced at the hearings on behalf of residents of the area. The objectors live in a residential area opposite the Rockwell Street yard in one and two-family homes built while the yard was in existence and operation. Their testimony followed the usual pattern of zoning cases and tended to show that there would be an increase in motor traffic dangerous to children, and that the noise, fumes, vibration and lights would be detrimental to property values. This evidence is not pertinent to the question whether the proposed operation is a continuation of an existing legal special use.

The crucial question is whether the proposed piggyback operation is a new use of the property in the sense of changing the original nature and purpose of the yard. While the loading and unloading of the trailers takes on the broad aspect of handling freight, it is in most essential respects no different from the operation now being conducted. The piggyback operation conforms to the procedure used in a

switching yard and has become a function in classification yards rather than of the freight terminals on other railroads. The primary difference between the yard as it is now and the way it will be with the proposed operation is the presence of trucks for the piggyback service. The trucks will produce noise, smoke, odors and vibrations but undoubtedly to a lesser extent than is already produced by the switch engines and diesel locomotives. Certainly the proposed operation is an innovation but we cannot say that it changes the character and design of the yard. An analogy may be drawn from the nonconforming use cases where we have recognized that it is the particular use to which the property is put rather than the general classification which controls. (*Dube* v. *City of Chicago*, 7 Ill.2d 313; *Du Page County* v. *Elmhurst-Chicago Stone Co*. 18 Ill.2d 479.) We are of the opinion that the installation and operation of the proposed facilities will be an integral part and continuation of the nature and purpose of the classification and switching yard.

Defendants also contend that even if the new operation is a continuation of the existing special use, the particular land upon which the proposed facilities are to be built has been vacant and consequently a new special use must be sought. The vacant ground is within the well-defined limits, and over the years has been a part of the Rockwell Street yard. The fact that every foot of it has not at all times been utilized does not mean that it was not part and parcel of the whole tract used for a yard purpose. All of the ground within the confines of the yard must be treated as an entirety, and if the use made of the yard is a legal special use of a part, it extends to the whole.

The zoning board of Chicago should have authorized the issuance of a permit to construct the 12 by 16-foot building which was refused by the zoning administrator and should have entered a decision that the construction and operation of the remaining piggyback facilities were permitted as a legal existing special use.

The judgment of the superior court of Cook County affirming the decision of the zoning board of appeals of the city of Chicago is reversed and the cause remanded, with directions to enter judgment in conformity hereto.

*Reversed and remanded, with directions.*