FORD CITY BANK AND TRUST COMPANY *et al.*, Plaintiffs-Appellants and Cross-Appellees, *v.* THE COUNTY OF KANE *et al.*, Defendants-Appellees and Cross-Appellants.

Second District   No. 82—323

Opinion filed May 17, 1983.

Jack M. Siegel and David R. Armstrong, both of Chicago, for appellants.

Robert J. Morrow, State's Attorney, of Geneva (Pamela K. Jensen and David R. Akemann, Assistant State's Attorneys, of counsel), for appellees.

JUSTICE VAN DEUSEN delivered the opinion of the court:

On December 4, 1980, plaintiffs filed a complaint against defendants seeking an injunction, declaratory judgment, and other relief primarily on the grounds that Ordinance No. 80-37, adopted by defendant Kane County on March 11, 1980, was invalid. After a bench trial, the trial court entered an order on March 25, 1982. That order upheld the validity of Ordinance No. 80-37 amending the zoning ordinance of Kane County; restricted the use of the subject property, a restricted landing area, to no more than 155 based airplanes; and granted plaintiffs the right to apply to defendant for such other use or intensification of the use according to the ordinance of defendant.

It is not clear from the record how many planes are now based at the Landings. However, there is presently space for 99 hangar units in 14 hangar buildings. Twelve of the buildings are constructed on the north side of the runway, and two buildings are constructed on the south side of the runway.

Plaintiffs appeal praying that the order of March 25, 1982, be modified in part and reversed in part to provide: that Ordinance No. 80-37 be declared unconstitutional on its face and as applied to the subject property; that plaintiffs are entitled to use the subject property for a restricted landing area for the basing of not less than 276 aircraft; that plaintiffs are entitled to use the entire area of the subject property, which was accorded a special use permit approved September 9, 1969, for a restricted landing area; and that damages of $4,500,000 be awarded or in the alternative the cause be remanded for a new trial on the question of damages.

Defendants cross-appeal from the March 25, 1982, order to the extent that order adjudged that plaintiffs are entitled to use the subject property as a restricted landing area basing up to 155 aircraft. Defendants seek to limit the number of aircraft to the number based there as of March 11, 1980, and such additional aircraft as are housed in hangars lawfully under construction on March 11, 1980.

This is an action brought by the Ford City Bank as trustee and mortgage holder of a part of the property developed as "The Landings," a condominium airport in unincorporated Kane County. The plaintiffs also include Barko Development Corporation, the beneficiary of the trust, and developer of the airport; the Landings Airstrip Corporation, owner of the landing strip; and the Landings Airport Condominium Owners Association, which consists of the owners of the 99

hangars at the airport. The airstrip corporation is wholly owned by the condominium association.

The subject property is the Landings Airport, a 53.7-acre private condominium airport. The surrounding area is zoned for agricultural and light industrial use. Adjoining the airport to the south are approximately 104 acres classified for single-family homes and developed by the plaintiffs.

On September 9, 1969, defendants adopted an ordinance granting plaintiffs' predecessor in title a special use for the 53.7 acres to be used as a restricted landing area. The ordinance did not contain restrictions with respect to the number of aircraft to be based at the airport. The underlying zoning for the landing area remained F-Farming district. On October 10, 1972, an ordinance granting single-family, R-1, zoning for the adjoining 104 acres was adopted. On June 8, 1973, a final plat for 41 lots was approved by the county and recorded with an additional 33 lots recorded on June 13, 1978. At the time of the trial, 25 homes had been built in the residential portion and 53 lots had been sold.

In 1972, a five-member group, including plaintiff Kovac, who is now president of Barko Development Corporation, acquired the airport and adjoining residential property. In April 1972, a notice of landing area proposal was filed with the FAA indicating that the anticipated number of aircraft in the next five years would be 15 multi-engine aircraft and 300 single-engine aircraft. FAA approval of the air space was obtained in 1972. That approval did not refer to the number of hangars which could be placed on the subject property. On December 13, 1972, the Illinois Division of Aeronautics issued a certificate to the Landings Airstrip Corporation to operate the airport. No reference was made on that certificate as to the number of hangars that could be built on the subject property.

Also in 1972 and 1973, defendants submitted plans to the county for the development of the airport. An early alternative plan was to tie the sale of hangars to lot ownership. That plan was abandoned as economically unfeasible. Another alternative plan proposed a hangar area on the north side of the runway together with a grass tie-down area and homes on the south side. This plan, dated March 12, 1972, showed 10 hangar buildings. (Referred to as defendants' exhibit No. 14 in the March 25, 1982, judgment order.) A subsequent plan dated May 25, 1972, also showed 10 hangar buildings on the north side of the runway with a grass tie-down area on the south side of the runway. (Referred to as defendants' exhibit No. 15 in the March 25, 1972, judgment order.)

Finally, a plan dated January 25, 1973, prior to plaintiffs' acquisition of the property, showed 39 buildings located on both sides of the runway, and according to plaintiff Kovacs, became the operative plan after Barko purchased the property in June 1973. A detailed drawing of the plan showed 17 buildings on the north side of the runway and 22 buildings on the south side. However, it is not clear from this plan how many individual hangar spaces were to be incorporated into these 39 buildings. Moreover, none of the three plans indicated how many individual hangar spaces were to be incorporated into the proposed hangar buildings or how many planes were to be based at the Landings.

Plaintiffs submitted the plans dated March 12, 1972, and May 25, 1972, to the county in 1972. Hangars in these plans are shown on the north side of the runway only. According to the testimony of Frank Olson, director of the Platting and Zoning Division of the Kane County Development Department, plaintiffs' plan dated January 25, 1972, was not in the Kane County files relating either to the airport or the subdivision. Phillip Bus, director of Kane County Development Department, testified that the county never evaluated plaintiffs' January 25, 1973, plan or any other site plan showing accommodations for 276 or more based aircraft at the Landings. Further, on cross-examination, Burrell Coppernoll, an employee of the Illinois Department of Transportation, Division of Aeronautics, testified that he had not seen the ultimate plan depicted by the January 25, 1972, site plan. The function of that division is to make sure that the physical standards for landing areas in the State are safe. The only testimony regarding submission of this site plan to the county was by plaintiff Kovacs, who was impeached by his prior inconsistent statement that it had not been submitted to the county.

According to the testimony of Frank Olson, there were no discussions prior to the summer of 1979 between anyone in the Kane County Development Department and anyone with Barko or in ownership of the Landings about the possibility of 276 hangars or 300 based aircraft. Further, Olson testified that all engineering discussions and studies were based on defendants' plan dated May 25, 1972, showing hangars on the north side of the runway only.

Press releases and brochures were released by Barko in 1972 and 1973 (referred to as defendants' exhibit No. 2 in the March 25, 1982, judgment order). The brochure for potential lot purchasers was a conceptual drawing showing that land had been set aside for 10 hangar buildings on the northwest side of the runway. The south side showed a proposed grass tie-down area only and no hangars. Nothing for dis-

tribution to potential lot buyers showed hangars on both sides of the runway. Moreover, plaintiffs' January 25, 1973, plan showing 39 buildings located on both sides of the runway was not released to the public.

On June 11, 1973, Ford City Bank as trustee acquired the airport and the adjacent residential property. Barko acquired the beneficial ownership under the trust. The initial loan by Ford City Bank to Barko was for $1,500,000. The loan proposal from the bank to Barko showed that the airport would include 112 separate hangars and sufficient tie-down space for approximately 175 airplanes. The loan was secured by the land itself, including 234 acres divided into four separate tracts.

The 1973 loan was not paid back, and the bank considered foreclosure. The bank made additional loans in 1975 and 1976 of approximately $2,500,000. The total loan was $3,500,000 for the airport and $500,000 for the single-family portion of the property. At the time of the trial, there was a balance of approximately $1,870,000 outstanding.

In 1974, Barko's attorney sent a letter to the Kane County Development Department explaining a proposal to change the ownership of the subject property to condominium units. There was no mention of intensity level. In response to that letter, Marvin Dunn, Kane County Assistant State's Attorney, indicated that the condominium format would be permissible. There was no mention of an intensity level in that opinion.

In 1976, construction of the hangars began. All construction of the hangars had to be approved by the Division of Aeronautics. Approval was given by the division on three different occasions up to March 15, 1978. Of the 14 buildings currently on the site, all but two ranch or executive hangars are on the north side of the runway. The ranch or executive hangars are on the southeast side of the runway. The airport is presently improved with 3,100 feet of paved and lighted airstrip, taxiways, fuel pumps and related facilities costing $1,970,000. Individual hangars range in price up to $36,000 per hangar. Each hangar was constructed pursuant to a building permit issued by the county. At the time of trial, a total of 87 of the 99 existing hangars had been sold.

Later, the 1976 loan expired because of an inability to sell sufficient hangars to amortize the debt. Foreclosure was instituted in 1979 or 1980 and a settlement agreement was executed. The bank testified that it recently decided that 250 hangars needed to be sold.

There were no representations made to the credit manager at the

bank by anyone at Kane County relating to the approval of 276 or 300 or any specific number of based aircraft, and there was nothing in the bank's file indicating county approval of a project to build hangar units for a specific number of airplanes.

In September 1976, plaintiff Kovacs received a letter from Valjean Smith, of the Division of Aeronautics, requesting documentation of the county's approval for basing 300 aircraft on the strip. In response, Kovacs sent the notice of landing area proposal he had originally filed with the FAA in which he projected 315 based aircraft at the Landings. However, Kovacs had received nothing from the FAA indicating that 300 planes would be acceptable.

Prior to 1976, there was no notice given and there were no hearings held prior to the issuance of orders by the Division of Aeronautics authorizing construction of hangars currently in place on the north side of the runway. Since that time, the division, as a matter of form, has sent out notices and given people an opportunity to comment. Division procedures provide that surrounding property owners and government bodies are to receive such notice. It is unclear why notice was not originally given.

In 1977, sale of the single-family lots commenced. The sales office was at the airport in front of the first hangar on the north side of the runway. At the time of the first sale of the lots, about 14 hangars were up. The runway was in as well as the taxiways. Before the first house was built, 48 hangars were in place. Plaintiff Kovacs testified that he informed purchasers with respect to the use of the airport and that the airport would be fully developed.

In 1979, an application for four more buildings containing 24 additional individual hangar units was filed with the Division of Aeronautics. The proposed hangars were projected for the south side of the runway. A plat of survey, dated August 25, 1978, showing the Landings Airport, was submitted to the Division of Aeronautics with the application. The plat was the most recent in the division file and the only one showing proposed construction on the southwest side of the runway. However, the division had no drawings or plats on file showing hangars or proposed hangars to house 276 or more airplanes.

The application for additional hangars was dropped because of complaints and because the new board of the condominium association felt that the north side should be developed before the south side. The condominium association and the Landings Airstrip corporation had determined at a meeting of the directors on November 3, 1979, that construction on the south side of the runway could pose a safety hazard. On January 18, 1980, plaintiff Kovacs represented to the condo-

minium association that he would not build on the southwest side of the runway and that he would build on the northeast side only. No subsequent application to the Division of Aeronautics was made.

In April 1979, a group of property owners brought suit against the county challenging the 1969 ordinance which had granted the special use for a restricted landing area. The trial court dismissed on the grounds of *laches* and this court affirmed. (*Blankenship v. County of Kane* (1980), 85 Ill. App. 3d 621.) The court based its decision on the fact that $2,500,000 had been spent on reliance on the ordinance and that any plaintiffs in that case not resident in the community in 1969 and presently living there had constructive knowledge of the special use ordinance.

On March 11, 1980, the county amended the zoning ordinance by Ordinance No. 80-37. That ordinance relegated restricted landing areas to nonconforming use status and prohibited increasing the number of aircraft based at such facilities. The ordinance also created an A-1 zoning district, "Airport-Restricted Landing Field," containing a special use category which would allow increases in intensity of use under certain circumstances by petition to the county. The plaintiffs have not petitioned the county to rezone the subject property to an A-1 district and procure the required special use which would bring them into conformity with the Kane County Zoning Ordinance.

Before considering the merits of plaintiffs' argument on appeal, it should be noted that Ordinance No. 80-37 confers a nonconforming use status on all airport uses, except those located in a newly adopted A-1 airport district, applicable only to airports operated and maintained by a local public entity or airport authority. The ordinance further restricts nonpublic airports in the A-1 airport district to 10 planes or less with no planes exceeding 12,500 pounds. The ordinance also provides that additional planes up to a maximum of 45 will be permitted under a special use. Under section 6.8 of the ordinance, restricted landing areas shall not be intensified by increasing the number of aircraft based at the restricted landing area at the time of the enactment of this ordinance.

I

■ Plaintiffs' first argument on appeal is that Ordinance No. 80-37 is unconstitutional on its face because under the statute there shall be no intensification of a nonconforming restricted landing area use so long as that use remains nonconforming; the weight of airplanes based at restricted landing areas is limited to 12,500 pounds or under;

the permitted use in an A-1 district is 10 based airplanes or less; there is a ceiling of 45 based airplanes in section 13.1—2a; and the definitions used in the ordinance are circular.

Plaintiffs' initial facial objection to Ordinance No. 80-37 pertains to section 6.8b which provides in pertinent part:

> "b. *Increased Intensity or Volume of Nonconforming Airport Use*
>
> A nonconforming use as restricted landing area shall not be intensified by increasing the number of aircraft based at such restricted landing area. The number of aircraft to be housed in hangars lawfully under construction at the date of the enactment of this ordinance shall be included in the number of aircraft based at a nonconforming restricted landing area for purposes of this Section 6.8(b)." (Kane County, Ill., Ordinance No. 80-37, An Ordinance Amending the Zoning Ordinance of the County of Kane, art. VI, sec. 6.8b (1980).)

Plaintiffs contend such a "blanket restriction" is void because it is unrelated to any safety considerations. Further, plaintiffs argue that jurisdiction and control over the restricted landing area is under the Aeronautics Act and not the County Zoning Act.

We disagree. A zoning ordinance's justification is founded upon exercise of the police power to secure the common welfare. A zoning classification must therefore bear a real and substantial relation to the public health, safety, comfort, morals or welfare. (*City of Loves Park v. Woodward Governor Co.* (1958), 14 Ill. 2d 623, 625.) Further, intensity of use is recognized as a proper element of zoning. *Chicago Title & Trust Co. v. City of Chicago* (1970), 130 Ill. App. 2d 45, 48, citing *Exchange National Bank v. City of Chicago* (1963), 28 Ill. 2d 341, and *Cosmopolitan National Bank v. City of Chicago* (1961), 22 Ill. 2d 367.

Section 6.8b of the ordinance clearly bears such a reasonable means of addressing not only Kane County's safety concerns but also the county's legitimate health and general welfare concerns relating to intensification of existing restricted landing area uses. Further, the need for regulation is particularly compelling since neither the FAA nor the Division of Aeronautics concerns itself with typical zoning considerations. In a letter from the FAA to plaintiff Kovacs, the acting chief of the Chicago Airport District Office wrote that the FAA only makes determinations with respect to the safe and efficient use of airspace by aircraft. Also, he noted that "this determination in no way pre-empts or waives any ordinance, laws or regulations or any other governmental body or agency." With respect to the Division of

Aeronautics, this court has held that the control over restricted landing areas conferred upon the Division of Aeronautics presupposes compliance with local zoning ordinances. (*County of Du Page v. Harris* (1967), 89 Ill. App. 2d 101, 110.) Finally, by statute, counties "shall have the power to regulate and restrict the location and use of buildings, structures and land for trade, industry, residence and other uses *** and restrict the intensity of such uses ***." Ill. Rev. Stat. 1981, ch. 34, par. 3151.

■ Plaintiffs' second objection is that the weight restriction of 12,500 pounds bears no relationship to public health, safety, and welfare. Citing *County of Cook v. Priester* (1976), 62 Ill. 2d 357, plaintiffs suggest that factors such as weight and number of planes should be based on the nature of the airport facility.

*Priester* is not applicable to this case. The court in *Priester* based its decision on the fact that the weight restriction at Palwaukee Airport would operate to the detriment of the public in general by limiting Palwaukee's ability to serve as a reliever airport to O'Hare Field. (62 Ill. 2d 357, 370.) The Landings is not designed to serve as a reliever to a large commercial facility because it is not open to the public except in cases of emergency or by invitation of a hangar owner. Further, plaintiff Kovacs testified that the runway is not large enough for planes over 12,000 pounds and the bylaws of the condominium declaration restrict the weight of aircraft at the Landings to 12,500 pounds. In this case, the weight restriction does have a relationship to public safety.

■ Plaintiffs' third and fourth objections are against the limit of 10 based airplanes at an A-1 district with a ceiling of 45 planes under a special use. Plaintiffs again argue that there is no relationship stated in the ordinance between the number or the size of airplanes and character of the facility and that there must be such a relationship for the ordinance to be facially constitutional.

Plaintiffs' argument is not persuasive here either. As defendants point out, the restricted landing area concept involves only one or two aircraft, fewer than 10% of all restricted landing areas in Illinois base over 10 aircraft, and plaintiffs can apply for a special use to increase the intensity. A regulation may be upheld as facially constitutional if reasonably related to public health, safety, and welfare. (See *Reedy v. City of Wheaton* (1981), 102 Ill. App. 3d 1082, 1083.) County classifications, here, are clearly reasonable. They are a proper means of controlling infrequent land uses, restricted landing areas basing over 10 aircraft.

Further, it is well established that a city may control an infre-

quent use which is beneficial but potentially inconsistent with normal uses by special permit. (See *Pioneer Trust & Savings Bank v. County of McHenry* (1968), 41 Ill. 2d 77, 84, and *Reedy v. City of Wheaton* (1981), 102 Ill. App. 3d 1082, 1084.) *Reedy* applies to this case even though the facts of that case differ. In *Reedy*, this court upheld the facial constitutionality of a regulation restricting gasoline service station development by special use permit on the grounds that such stations pose potentially serious problems which may include traffic congestion, noise, danger of fire from fuel storage, and depreciation of surrounding property values. (102 Ill. App. 3d 1082, 1083-84.) This same reasoning is applicable to airport facilities such as the Landings.

Plaintiffs final objection with regard to the facial unconstitutionality of the ordinance in question is that the definition of "restricted landing field" found in section 2, article III, of Ordinance No. 80-37 is circular. A "restricted landing field" includes "any area of land which is used or intended for use for the landing and taking off of aircraft authorized in an A-1 District," whereas, article V, section 5.11 of the ordinance states that the definition of words and phrases used in the ordinance shall be the same as those contained in the rules and regulations of the Department of Transportation, Division of Aeronautics unless otherwise defined. Under the rules of the Division of Aeronautics, "restricted landing fields" are included in the term "restricted landing area." But the definition of "restricted landing area" under the division's rules is defined as "any area of land, water or both, which is used or made available for the landing and take-off of aircraft, the use of which shall, except in the case of emergency, be only as provided from time to time by the Department." Plaintiffs contend that it is not clear whether the Landings Airport which was approved in 1969 as a "restricted landing area" is now within the definition of a "restricted landing field" as defined by uses in the A-1 District. The inference is that as a "restricted landing area," the article VI restriction on increased intensity of a nonconforming use does not apply to the Landings. The reasoning is that the nonconforming use section of article VI applies only to the "restricted landing fields" which are A-1 District uses as defined under section 2, article III. The Landings is not an A-1 District use. It is in a farming classification.

Defendants justifiably dismiss plaintiffs' fifth objection as unwarranted. The subject property is clearly within the definition of "restricted landing field" because it is used for the landing and takeoff of aircraft authorized in an A-1 District—specifically airplanes. A "restricted landing field" as defined in the ordinance is but one kind of "restricted landing area" as defined by the Division. Also, the article

VI restriction on increased intensity applies to all nonconforming fields, including the Landings. Reading the ordinance as a whole, plaintiffs' technical attack on the definitions under article V and article VI cannot be considered as valid.

## II

Plaintiffs' second argument on appeal is that Ordinance No. 80-37 is unconstitutional as applied.

The following principles are to be considered in determining the validity of Ordinance No. 80-37. First, the principal standard used for determining the validity of a zoning ordinance is whether the ordinance as applied bears any substantial relation to public health, safety or welfare. (*Wright v. County of Winnebago* (1979), 73 Ill. App. 3d 337, 341, citing *Tomasek v. City of Des Plaines* (1976), 64 Ill. 2d 172, 179-80.) The *Wright* court acknowledged that while the technical safety problems of a proposed restricted landing field are concerns of the Division of Aeronautics, the broader public-safety question and the general welfare of the public are the concerns of the local zoning authorities in the context of regulating restricted landing area uses. 73 Ill. App. 3d 337, 345.

■ Zoning ordinances are presumed to be valid, and the burden of proof remains on the plaintiffs to overcome the presumption by clear and convincing evidence. (*La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46.) Finally, in establishing the invalidity of a zoning ordinance, the plaintiffs have the burden of showing that the ordinance as applied is arbitrary and unreasonable and bears no relation to public health, safety and general welfare. *Tomasek v. City of Des Plaines* (1976), 64 Ill. 2d 172, 179-80.

■ The factors traditionally considered in weighing the validity of a zoning ordinance are found in *Wright v. County of Winnebago* (1979), 73 Ill. App. 3d 337, 341. Those factors are (1) the existing uses and zoning of nearby property; (2) the extent to which surrounding property would be depreciated by the proposed use; (3) the suitability of the subject property for the zoned purposes; (4) the extent to which the reduction in the value of the property promotes the health, safety, morals or general welfare of the public; and (5) the relative gain to the public as compared to the hardships imposed on the property owner. 73 Ill. App. 3d 337, 341.

■ Both parties argue the applicability of the *Wright* factors. The following discussion considers these factors in weighing the validity of Ordinance No. 80-37. First, nearby property to the south and south-

west of the airport is an R-1 residential subdivision. This subdivision abuts the airport where the plaintiffs propose to build a substantial number of hangars. This residential property was zoned R-1 in 1972, which is well before the county knew of the ultimate plan proposed by plaintiffs. At trial, there was expert testimony that the proposed expansion would be incompatible with existing homes and proposed development. The fact that the residential lots were purchased with the knowledge of an existing restricted landing area does not permit intensification of the existing use because the county has legitimate general welfare concerns to limit intensification. Finally, the testimony of the neighbors is inconsistent as to how many aircraft would be based on the Landings Airport. However, none bought with any knowledge that the use of the property would reach an intensity of 276 or more planes.

Second, there was testimony that the proposed intensification would have an adverse impact on the marketability and value of residences currently built as well as on lots yet to be developed. While it is true that there was never any question as to the proposed use, there is no evidence of knowledge on the part of purchasers as to how extensive that use would be.

Third, it is also correct, as supported by the testimony, that the highest and best use of the property is for airport purposes. However, the question is not one of suitability for use of the property as a restricted landing area. The question, as defendants correctly note, is the suitability of the property for 276 or more aircraft and for 276 hangars located on both sides of the runway. There is considerable testimony as to the safety hazards and inadequacy of the layout for 276 or more aircraft, indicating that the subject property is not suitable for such a use.

Fourth, defendants correctly point out that a reduction in value of the subject property is significant only when the public welfare does not require the restriction. (*Wilson v. County of McHenry* (1981), 92 Ill. App. 3d 997, 1001.) However, the testimony shows that the public welfare does require county regulation of restricted landing area as the airport is uncontrolled.

Plaintiffs also strongly argue that according to the testimony of James Coleman, an MAI appraiser, the value of the airport with 155 hangars, as ordered by the trial court, deprives the plaintiffs' of the value of 121 hangars or approximately $4,500,000. However, that argument is not strong enough to overcome the welfare concerns of the county. While the economic hardship imposed on plaintiffs is arguably substantial, a lost profit from a proposed development prevented by a

zoning ordinance is not decisive in determining whether the exercise of the police power is unreasonable and invalid as applied. (*Honeck v. County of Cook* (1957), 12 Ill. 2d 257, 260.) Such a hardship appears in practically all cases involving a more intensive use. (*Wilson v. County of McHenry* (1981), 92 Ill. App. 3d 997, 1002.) In determining the validity of the ordinance as applied, the overriding concern must be one of public safety over development company and bank losses.

For the foregoing reasons, we hold that Ordinance No. 80-37 is reasonably related to the public health, safety, and general welfare, and is upheld as valid in its application to the present case.

## III

■ Plaintiffs' third argument on appeal is that the ordinance of September 1969 granted a special use which entitled plaintiffs to develop the entire property as a legal nonconforming use for 276 hangars. Plaintiffs base their argument on two theories. First, they claim that the legal nonconforming use extends to the entire 53.7 acres and that the installation of additional hangars is an integral part of the use as an airport. Second, they base their claim on the fact that substantial improvements were made in anticipation of utilizing the entire tract for airport purposes.

While the right to a nonconforming use is a property right, a governmental body may restrict a nonconforming use as may be necessary for the public health, comfort, safety, or welfare. (*Village of Burr Ridge v. Elia* (1978), 65 Ill. App. 3d 827, 829.) Ordinance No. 80-37 is such a restriction; its relationship to the public health, safety, and general welfare has already been determined.

■ This court has also recognized that where a county ordinance prohibits expansion of a nonconforming use and does not expressly permit expansion to the entire property, an increase in the number of vehicles stored on a nonconforming property may constitute an unlawful expansion of use. This is the case even where the general classification of the use remains unchanged. (*Village of Lake Villa v. Fargo Ice & Sons, Inc.* (1980), 90 Ill. App. 3d 545, 546-47.) The Kane County Zoning Ordinance does prohibit the expansion or extension of a nonconforming use and does not expressly permit expansion to the entire property. (Kane County, Ill., Zoning Ordinance secs. 6.3—5, 6.3—6 (1980).) An increase in intensity as proposed by plaintiffs would be arguably unlawful even though there was no provision in Ordinance No. 80-37 precluding intensification of nonconforming restricted landing area uses.

Plaintiffs cite *Howard v. Lawton* (1961), 22 Ill. 2d 331, for the proposition that where a nonconforming use is established for a specific tract of land, it is not necessary that the entire tract be actually utilized or covered by improvements in order for the nonconforming use to extend to the entire tract. The court in that case held that the installation of a "piggy-back operation" in a railroad switching yard was an integral part and continuation of the nature and purpose of the existing use. 22 Ill. 2d 331, 338.

While the court held that the land in *Howard* must be treated as an entirety, the difference in the nature of the use in *Howard* and the use here prevents that case from applying to the present case. The concept of a restricted landing area, as shown by the evidence in this case, does not encompass plaintiffs' proposed use. Tripling the intensity of the subject property is a different use and not a continuation of an existing use. As noted in *Dube v. City of Chicago* (1955), 7 Ill. 2d 313, "Though the new use and the old use may fall within the general category *** it is the particular use and not the general classification which governs." (7 Ill. 2d 313, 322.) In this case, the fact that the proposed different use is also an airport use is not enough to afford it the protection of the 1969 ordinance that protects the present existing use.

Plaintiffs also submit that they had made substantial improvements in anticipation of utilizing the subject property as proposed and urge this as additional grounds for extending their nonconforming uses. However, the record does not support a conclusion that the improvements were made in legitimate anticipation of the construction of 276 hangars to base that many or more aircraft.

Plaintiffs base their argument on *Pioneer Trust & Savings Bank v. County of Cook* (1978), 71 Ill. 2d 510. However, that case is distinguishable from the present case because plaintiff openly proposed the construction of 728 units of a retirement-housing project and Cook County was apprised of plaintiff's specific plans prior to the time its zoning administrator informed plaintiff that the project would be a permitted use. 71 Ill. 2d 510.

In contrast, no one at the county in the case at bar, was aware of the true nature of plaintiffs' intentions until four years after when Marvin Dunn, Kane County Assistant State's Attorney, issued his opinion that a condominium format would not be inconsistent with the 1969 special use. The record shows that it was not until 1979 that Dunn first saw plaintiffs' January 25, 1973, plan allegedly indicating 276 hangars located on both sides of the runway.

Also to be distinguished is plaintiffs' reliance on *County of Du*

*Page v. Elmhurst-Chicago Stone Co.* (1960), 18 Ill. 2d 479, and *County of Du Page v. Gary-Wheaton Bank* (1963), 42 Ill. App. 2d 299. Those cases represent an exception to the rule that an owner is entitled to the protection of a lawful nonconforming use when the subject property is in actual use, to be distinguished from or merely contemplated use, at the time a zoning restriction becomes effective. Both cases also involved mining operations which presents a factually different situation than the present case.

Plaintiffs are not entitled to further develop the nonconforming subject property to 276 hangars based on the September 1969 special use.

## IV

■■ Plaintiffs' fourth argument on appeal is that plaintiffs changed their position in good faith reliance on the September 1969 use in a manner which precludes the application of Ordinance No. 80-. 37. The basis of plaintiffs' argument is that they have a vested property right to the proposed use intensity because they relied on the special use ordinance of 1969, and expended approximately $2,500,000, and as a result, the amendatory ordinance of March 1980 is inapplicable.

To find a vested right to the extent of 276 hangars, there must be some proof plaintiffs' use was "made in good faith by an innocent party under a building permit or in reliance upon the probability of its issuance." *People ex rel. Skokie Town House Builders, Inc. v. Village of Morton Grove* (1959), 16 Ill. 2d 183, 191; see also *Pioneer Trust & Savings Bank v. County of Cook* (1978), 71 Ill. 2d 510, 522-24.

In this case, there has been no proof of a building permit having been issued which defendants now seek to revoke. Also, no probability of the issuance of building permits for 276 hangars has been demonstrated. Moreover, there has been no proof that a plan for a facility of the proposed intensity now contemplated by plaintiffs was ever submitted to or approved by the county. Where such plans have been submitted to or approved by the governing body, the courts are able to find a basis for good faith reliance. Such plans were submitted in two cases cited by plaintiffs in support of the vested rights theory. *Pioneer Trust & Savings Bank v. County of Cook* (1978), 71 Ill. 2d 510, 515; *Industrial National Mortgage Co. v. City of Chicago* (1981), 95 Ill. App. 3d 666, 668.

The plans submitted to the county in the present case showed 10 buildings to be used as hangars on the north side of the runway. The

evidence disclosed that, at the time of the passage of Ordinance No. 80-37, the plaintiffs had constructed, or had under construction, 12 hangar buildings on the north side of the runway and two executive hangars on the south side. These plans do not serve as a basis upon which plaintiff can claim a vested right for additional hangars or increased intensity of use. While the evidence established that plaintiffs had expended approximately $2,500,000 in improving the facility, it cannot be said that such expenditures were made in good faith upon reliance of some act or promise of the county or its agents that permission would be granted to continue to construct additional hangars or otherwise increase intensification of the use of the subject property. Plaintiffs do not have a vested property right for the use of the property to a specific intensity level which precludes the application of Ordinance No. 80-37.

## V

Plaintiffs' final argument on appeal is that the trial court erred in not finding that Ordinance No. 80-37, as applied to plaintiffs' property, constituted a violation of section 1983 of title 42 of the United States Code. (42 U.S.C. sec. 1983 (1976).) Plaintiffs claim that under that statute they are entitled to damages. As we have upheld Ordinance No. 80-37 as being valid and constitutional and determined that it did not violate any federally protected constitutional rights of the plaintiffs, the trial court properly found that defendant had not violated section 1983 of title 42 of the United States Code.

## VI

In their cross-appeal, defendants contend that the trial court's order is in error to the extent that it would permit plaintiffs to use the subject property to base 155 planes thereon without applying to the defendant for proper zoning. We agree. We have carefully examined the exhibits upon which the trial court based this finding and can perceive no grounds for such a finding and therefore agree that it was in error.

The judgment order of the trial court, therefore, must be modified in part. We regret that our review of the evidence in this matter does not permit us to determine with certainty the number of airplanes based on the premises in hangars already constructed or under construction on March 11, 1980, when Ordinance No. 80-37 was adopted. An additional evidentiary hearing may be required to determine such

number, unless the parties are otherwise able to agree.

Accordingly, we modify the judgment portion of the trial court's March 25, 1982, order as follows:

IT IS THEREFORE ORDERED AND ADJUDGED AS FOLLOWS:

A. That the Zoning Ordinance of the County of Kane as amended, on its face and as applied is valid and reasonable and bears a reasonable relationship to the public health, safety, welfare and morals.

B. That, subject to the uses of the premises in existence on March 11, 1980, the plaintiffs or any person claiming by, through or under them are entitled to use the subject property only for those purposes permitted under the Zoning Ordinance of Kane County under the F-Farming Special Use for a Restricted Landing Area, providing plaintiffs comply with all other relevant regulations and laws of the County of Kane, the State of Illinois and the United States as applicable to such a use.

C. That the plaintiffs or any persons claiming by, through or under them are prohibited from intensifying the use of the subject property as a restricted landing area by increasing the number of aircraft beyond that number of aircraft based there on March 11, 1980, and such additional aircraft as are housed in hangars which were lawfully under construction on March 11, 1980, unless such increased use is permitted under the Ordinance of the defendant.

D. That plaintiffs have the right to apply to the defendant for such other use or intensification of use according to the ordinance of the defendant.

The judgment of the trial court as modified is affirmed.

Affirmed as modified.

HOPF and REINHARD, JJ., concur.